[Cite as *State v. Morton*, 2021-Ohio-581.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,                           :

    Plaintiff-Appellee,              :

                          No. 109200

    v.                               :

JEREMIAH MORTON,                         :

    Defendant-Appellant.             :

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:**  March 4, 2021

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-19-636658

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Marcus A. Henry and Tasha L. Forchione, Assistant Prosecuting Attorneys, *for appellee*.

Ariel Burr, *for appellant*.

LARRY A. JONES, SR., P.J.:

{¶ 1}   Defendant-appellant Jeremiah Morton ("Morton") appeals his rape, kidnapping, and aggravated burglary convictions that were rendered after a jury trial.  He contends that he received ineffective assistance of trial counsel and that

the cumulative effect of trial counsel's errors deprived him of a fair trial.  For the reasons that follow, we affirm.

**Factual and Procedural History**

{¶ 2}   The charges in this case came about after an encounter Morton had with individuals who were developmentally disabled, and one who had psychiatric challenges.  On an afternoon in December 2018, two of the developmentally disabled persons and the one individual with psychiatric challenges went to a Metro PCS store to purchase a new cell phone.  The group consisted of one male and two females.  There, they encountered Morton, who introduced himself to the group as "Tony."  He told them that he could help them get a good deal on a new phone (which did not materialize).  No one in the group had previously met or known of Morton.

{¶ 3}   When the group left the cell phone store, Morton left with them and "tagged along."  The group arrived at the house of the one male in the group.  The house was an assisted-living house maintained by the Cuyahoga County Board of Developmental Disabilities; it was located in a neighborhood with a cluster of homes maintained by the Board.  Everyone, including Morton, went into the house.  According to the male owner, he tried to stop Morton from entering the house, but Morton just "barged" his way in.

{¶ 4}   Once inside the house, Morton started cleaning and tidying up.  He then told the group he was going to make dinner for them and started cooking.

There was also alcohol (vodka) and Morton was making drinks. For the most part, the group was having fun with him — he was funny and friendly.

{¶ 5} Another friend, M.D., a female, who had not previously been with the group, came to the house. M.D. testified that she had an "iffy" feeling about Morton. Morton referred to himself as "Uncle Tony," he was flirting with one of the other females and trying to get her to go into the bathroom with him, and he asked all the females if they had ever had sex with a black man. Feeling uncomfortable, M.D. left the house.

{¶ 6} Later in the evening, the victim, T.B., arrived at the house; she testified that she had been dropped off by her mother. T.B. was 27 years old at the time, had Asperger's Syndrome, and was on antidepressant medication for a "strange kind of migraine" she suffered from. T.B. testified that Morton gave her, and she consumed, two cups of a drink consisting of vodka and ginger ale. She testified that she is an occasional social drinker, but had never had vodka before that evening. She believed that the combination of the vodka and her antidepressant medication caused her to become lethargic and drunk.

{¶ 7} After having the drinks, Morton asked T.B. if he could talk to her in the bathroom. T.B. agreed, believing that they were just going to talk. Her friends tried to stop Morton from taking T.B. into the bathroom, but Morton told them that he and T.B. and were just going to talk. The friends testified that Morton had to help T.B. into the bathroom.

{¶ 8} T.B. testified that once in the bathroom, Morton orally raped her. She told Morton "no," but Morton insisted and she acquiesced because she was scared. T.B. testified that after the oral rape, she attempted to leave the bathroom, but Morton forced her against the bathroom sink and vaginally raped her. Again, T.B. protested, but Morton moved her back and forth from the toilet to the sink and continued to rape her.

{¶ 9} Meanwhile, M.D., the friend who had an uneasy feeling about Morton and who had left the house, had called the police. When Morton and T.B. exited the bathroom, the police were at the house. T.B. did not tell the police at that time that Morton had raped her. Morton gave the police a fake name, and after everyone had been questioned, the police escorted Morton from the apartment — telling him he was not welcome there.

{¶ 10} By this time, M.D. was back at the house and she and T.B. talked about what happened in the bathroom; M.D. testified that T.B. was crying and rocking back and forth. After talking with T.B., M.D. called the police again. Different officers arrived, and after talking with T.B. and her friends they requested an ambulance to transport T.B. to the hospital for a sexual-assault examination. One of the officers was wearing a body camera, which captured the police's interaction with T.B. and her friends. The recording from the body camera was discussed during the testimony at trial, but it was not admitted into evidence. The results of the rape kit revealed that an epithelial fraction of Morton's DNA was found in T.B.'s perianal and vaginal area.

**{¶ 11}** Morton was arrested and charged with four counts of rape; one count of kidnapping; and one count of aggravated burglary. The jury found Morton guilty on all counts. The trial court sentenced him to a 20-year prison term. Morton now appeals and raises the following two assignments of error for our review:

    I.     Appellant was deprived of his constitutional right to effective assistance of counsel when trial counsel failed to, (A) object to prosecutorial misconduct, (B) effectively challenge the credibility of witnesses during cross examination, (C) effectively impeach witnesses' prior inconsistent statements during cross examination, and (D) introduce exculpatory and mitigating evidence.

    II.    The cumulative effect of error throughout the trial violated Appellant's Sixth Amendment right to a fair trial.

## Law and Analysis

### Ineffective Assistance of Counsel

**{¶ 12}** In his first assignment of error, Morton contends that his trial counsel was ineffective based on counsel's failure to (1) object to instances of prosecutorial misconduct; (2) effectively cross-examine witnesses in light of their memory issues and developmental disabilities; (3) effectively cross-examine witnesses in light of inconsistencies in their prior statements; and (4) introduce exculpatory and mitigating evidence.

**{¶ 13}** To prevail on a claim of ineffective assistance of counsel, a criminal defendant must establish (1) deficient performance by counsel, i.e., performance falling below an objective standard of reasonable representation, and (2) prejudice, i.e., a reasonable probability that, but for counsel's errors, the result of the

proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Short*, 129 Ohio St.3d 360, 2011-Ohio-3641, 952 N.E.2d 1121, ¶ 113. Failure to satisfy either part of the test is fatal to the claim. *State v. Bradley*, 42 Ohio St.3d 136, 143, 538 N.E.2d 373 (1989).

{¶ 14} In Ohio, a properly licensed attorney is presumed competent. *State v. Gondor*, 112 Ohio St.3d 377, 2006-Ohio-6679, 860 N.E.2d 77, ¶ 62. Thus, in reviewing a claim of ineffective assistance of counsel, we must indulge in a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." *Strickland* at 697.

{¶ 15} Morton contends that the assistant prosecuting attorney engaged in misconduct in numerous statements he made in either opening statement or closing argument, and defense counsel failed to object. Parties are generally granted considerable latitude in presenting opening statements, so long as the matters referred to can be shown by competent or admissible evidence. *Columbus v. Hamilton*, 78 Ohio App.3d 653, 657, 605 N.E.2d 1004 (10th Dist.1992). Parties are also accorded great latitude in closing arguments. *State v. Maurer*, 15 Ohio St.3d 239, 269, 473 N.E.2d 768 (1984).

**Defendant's Right to Remain Silent**

{¶ 16} Morton first contends that the assistant prosecuting attorney engaged in misconduct in closing argument with the following statement, which

Morton contends was a reference to Morton's decision not to testify: "Keep in mind ladies and gentlemen, that a defense to forcible rape is consent. You are to consider the evidence that you have heard and seen in this courtroom. What evidence have you heard or seen that she said anything but no?"

{¶ 17} Morton is correct that a prosecutor's comments regarding a defendant's refusal to testify violate the accused's Fifth Amendment right to remain silent. *See Griffin v. California*, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965), syllabus. Prosecutors' comments on a defendant's refusal to testify have always been looked upon with extreme disfavor because they raise an inference of guilt from the defendant's decision to remain silent. *State v. Thompson*, 33 Ohio St.3d 1, 14, 514 N.E.2d 407 (1987). In effect, such comments penalize a defendant for choosing to exercise a constitutional right. *Id.* Prosecutors must therefore take care not to equate the defendant's silence to guilt. *Id.*, citing *State v. Rogers*, 32 Ohio St.3d 70, 512 N.E.2d 581 (1987).

{¶ 18} While direct comment on an accused's failure to testify does violate the Fifth Amendment's self-incrimination clause, "[a] reference by the prosecutor in closing argument to uncontradicted evidence is not a comment on the accused's failure to testify, where the comment is directed to the strength of the state's evidence and not to the silence of the accused, and the jury is instructed not to consider the accused's failure to testify for any purpose." *State v. Ferguson*, 5 Ohio St.3d 160, 450 N.E.2d 265 (1983), paragraph one of the syllabus.

{¶ 19} The assistant prosecutor's reference, in the above-mentioned remarks, to the uncontradicted evidence was directed to the strength of the state's evidence. In fact, the assistant prosecuting attorney reiterated that it was the state's burden of proof several times during his opening statement and voir dire. For example, one potential juror, a human resources professional, indicated that she was used to listening to "both sides of a story" at work. The assistant prosecuting attorney reminded the potential juror that it was solely the state's burden of proof, and questioned the juror if she could be fair and impartial if she only heard "one side of the story." Moreover, the trial court instructed the jury not to consider Morton's decision to not testify for any purpose.

{¶ 20} Even if Morton was the only potential witness who could have contradicted the victim's testimony, the analysis does not change. *See Ferguson* at 163 ("The thrust of [the defendant's] contention is that he was the only potential witness in a position to contradict the victim's testimony. As a result, [the defendant] argues that references to uncontradicted evidence necessarily focus attention on the failure of the accused to take the stand. We disagree.").

{¶ 21} In light of the above, defense counsel was not ineffective for not objecting to the assistant prosecuting attorney's remarks.

**Facts not in Evidence and Misstatements of Evidence**

{¶ 22} Morton next contends that, without objection from the defense, the assistant prosecuting attorney argued facts not in evidence and misstated evidence numerous times. The first instance Morton contends occurred when, in his

opening statement, the assistant prosecuting attorney stated, "What you will learn is Mr. Morton does not know these people. He's seen them around the neighborhood, but he does not know them, but he knows that, from what he's seen, they are developmentally disabled." The second statement he complains of, also made in opening statement, was as follows: "He knew there was something wrong with them; and when [T.B.] shows up, he knows — she shows up because her mom drops her off. Almost a 30-year-old woman whose mom dropped her off at this house."

{¶ 23} Morton contends that these statements implicated his Fifth Amendment right; that is, he was the only person who would have been able to testify as to whether he knew the group. But the individuals also testified that they did not know Morton — they initially encountered him in the Metro PCS store, and thereafter Morton spent the entire day with them. It is true that the evidence did not establish that Morton had seen them around the neighborhood. But he did have an opportunity to see and interact with them at the cell phone store. And the testimony demonstrated that while the individuals were "functioning" adults, there were indicators that they may have had disabilities. A reasonable inference from that could be that Morton observed the group and singled them out as a group he could latch on to. Thus, the assistant prosecuting attorney's statements were proper for what he believed the strength of the state's case would be. Defense counsel's failure to object to the fleeting remark that Morton had seen the group around the neighborhood did not rise to ineffective assistance of counsel.

{¶ 24} The remaining statements Morton cites as objectionable occurred during closing argument, when the assistant prosecuting attorney argued the following: (1) "[T.B.] was substantially impaired because of autism"; (2) "[Morton] gave the police a different name. He did that because he knew sooner or later in that day something was going to take place that he didn't want to answer for, and that's why he gave them a fake name"; and (3) "[T.B.] testified that she never drank alcohol before."

{¶ 25} In regard to the statement about T.B.'s autism, Morton contends that the statement was not supported by any testimony and, therefore, the "misstatement of evidence [was] meant to tug at the heartstrings of the jury and enrage them." We are required to look at the closing argument as a whole to determine whether it deprived Morton of a fair trial or prejudiced him. *State v. Were*, 118 Ohio St.3d 448, 2008-Ohio-2762, 890 N.E.2d 263, ¶ 198. Throughout the closing argument, the assistant prosecuting attorney argued that the combination of the medicine T.B. took with the alcohol impaired her; he also noted her Asperger's diagnosis. The record supported the state's argument. T.B. testified that the combination of the alcohol and her medicine made her feel drunk and lethargic. And her friends testified that Morton had to help her to the bathroom. The assistant prosecuting attorney's statement neither deprived Morton of a fair trial nor prejudiced him. Defense counsel was not ineffective for not objecting.

{¶ 26} The next alleged misstatement Morton cites is the assistant prosecuting attorney's argument that Morton gave the police a fake name because

there was something he did not want to answer for. That was not a misstatement — Morton gave two different names during the relevant time frame: one name ("Tony") to the group of individuals and another name ("Malcom Cline") to the police. Prosecutors may draw reasonable inferences from the evidence at trial, commenting on those inferences during closing argument. *State v. Lipkins*, 10th Dist. Franklin No. 16AP-616, 2017-Ohio-4085, ¶ 23. It was a reasonable inference that Morton gave fake names to the group and to the police because he wanted to conceal his identity and, therefore, counsel was not ineffective for failing to object.

{¶ 27} The final alleged misstatement Morton contends deprived him of a fair trial was the assistant prosecuting attorney's statement that T.B. never drank alcohol before. T.B. did testify that she was an occasional, social drinker. But she did testify that she had never had vodka before. Her friends also testified that she was not a heavy drinker. Based on the testimony, along with the trial court's instructions that opening statements and closing arguments were not evidence, the assistant prosecuting attorney's statement did not deprive Morton of a fair trial and defense counsel was not ineffective for not objecting. Moreover, shortly after the assistant prosecuting attorney made the argument about T.B. never having had alcohol before, he argued to the jury, "I wrote down what she said * * * she said she never had vodka before."

{¶ 28} In light of the above, we find no merit to Morton's contention that his counsel was ineffective for failing to object to alleged facts not in evidence and misstatements of evidence.

**Witness Vouching**

{¶ 29} Morton's next ground for ineffective assistance of counsel was counsel's failure to object to the assistant prosecuting attorney vouching for two of the state's witnesses during closing argument. The assistant prosecutor argued as follows in regard to T.B.'s testimony:

> When you are deciding whether or not you believe what she told you, think about did she have a motivation to lie to you? She told her friends what Jeremiah Morton did to her. She told the police. She told the detective what Jeremiah Morton did to her. She went to the hospital. She submitted herself to an invasive medical procedure. She came in here and sat and told 12 complete strangers in open court what he did to her. What does she stand to gain from that? What motivation does she have to lie about what he did to her in the bathroom?

{¶ 30} The assistant prosecuting attorney made a similar statement about another one of the state's witnesses arguing "what motive did she have to lie?"

{¶ 31} It is improper for a prosecutor to vouch for a witness; that is, to express an opinion or personal belief as to the credibility of that witness by "imply[ing] knowledge of facts outside the record or by plac[ing] the prosecutor's personal credibility in issue." *State v. Jackson*, 107 Ohio St.3d 53, 2005-Ohio-5981, 836 N.E.2d 1173, ¶ 117, citing *State v. Keene*, 81 Ohio St.3d 646, 666, 693 N.E.2d 246 (1998); *see also State v. Williams*, 79 Ohio St.3d 1, 12, 679 N.E.2d 646 (1997). But a prosecutor may argue that the other evidence corroborates a witness's testimony, especially when the witness's credibility is attacked. *Jackson* at ¶ 120. And the prosecutor may note that a witness lacked a motive to lie, because the witness was testifying against the self-interest of safety, where the comment is

supported by the record. *See id.* That is what occurred in this case, not improper vouching or improper reference to matters outside of the evidence.

**Inflaming the Jury**

{¶ 32} Morton's next contention of ineffective assistance of counsel based on prosecutorial misconduct relates to an allegation of inflaming the jury. At trial, one of the state's witnesses testified that while Morton and T.B. were in the bathroom she thought she "heard a little bit of bumping, but that's about it and whining, but that's it." The witness testified that after Morton left, T.B. "was sitting on the toilet. She looked a little nervous, but that is normal [T.B.] rocks a little bit nervously. She's always somewhat nervous looking."

{¶ 33} In reference to that testimony during closing argument, the assistant prosecuting attorney argued that T.B. "wince[d] out in pain," and that when her friend saw T.B. after, T.B. was "shaking," she was "trying to cope." Morton claims that the assistant prosecuting attorney misstated the testimony so as to inflame the jury. Another one of the state's witnesses, however, did specifically testify that T.B. was "shaking and crying" as the police escorted Morton off the premises. Further, the distinction between "whining" and "wincing out in pain" was not significant enough to qualify as a misstatement intended to inflame the jury. It was clear from the testimony that the witness heard something when Morton and T.B. were in the bathroom. Although the witness described it as "whining" instead of "wincing out in pain," we find no prejudice to Morton as a result of the assistant prosecutor's

comment when viewed in light of the entirety of the state's closing argument. Defense counsel was not ineffective for not objecting.

**Misstatement of Law**

{¶ 34} Morton also complains that the assistant prosecuting attorney misstated the law and the trial court's instructions, without objection from defense counsel. First, the assistant prosecuting attorney stated, in reference to the indictment, the following: "We are not here by accident. We are not here because nothing happened * * * so the indictment is more than just notice to Jeremiah Morton what he is being charged with. This is also our contract with the community that we can prove each and every element of each charge contained in this indictment." This argument pushes the envelope of propriety.

{¶ 35} The first part of the assistant prosecuting's argument — "[w]e are not here by accident. We are not here because nothing happened * * * so the indictment is more than just notice to Jeremiah Morton what he is being charged with" — was not proper. However, it was cured by the trial court's instruction to the jury. Specifically, the instruction informed the jury that the indictment was nothing more than the instrument by which Morton was given notice of the charges against him and it carried no greater weight of guilt. And other comments by the assistant prosecuting attorney throughout the trial affirmed that it was the state's burden to prove every element of every crime beyond a reasonable doubt.

{¶ 36} Likewise, the second part of the assistant prosecuting's statement — "our contract with the community that we can prove each and every element of

each charge contained in this indictment" — was not proper. The indictment did set forth the charges the state brought against Morton, and the state was charged with proving every element of the crimes charged, but the portion of the statement, "that we can prove," was pushing the envelope and we caution the state against such statements. But when we view the entirety of the trial, we are not able to find that Morton was deprived of a fair trial or that his counsel was ineffective.

{¶ 37} The other alleged misstatement Morton contends went unobjected to occurred when the assistant prosecuting attorney told the jury that trial court was allowing an instruction on the lesser-included offense of sexual battery "because the evidence shows it." This statement is a close call. But the trial court's instruction, which juries are presumed to follow, correctly stated that "if the evidence warrants it," the jury could find Morton guilty of the lesser-included offense of sexual battery. Thus, we find the assistant prosecuting attorney's comments harmless.

**Cross-examination of Witnesses**

{¶ 38} Morton next contends that his trial counsel was ineffective because he failed to properly cross-examine some of the state's witnesses. Specifically, Morton complains that his trial counsel failed to cross-examine T.B. and her friends about their disabilities and memory-recollection issues.

{¶ 39} Generally, "[t]he extent and scope of cross-examination clearly fall within the ambit of trial strategy, and debatable trial tactics do not establish ineffective assistance of counsel." *State v. Leonard*, 104 Ohio St.3d 54, 2004-

Ohio-6235, 818 N.E.2d 229, ¶ 146. Moreover, "'[a]n appellate court reviewing an ineffective assistance of counsel claim must not scrutinize trial counsel's strategic decision to engage, or not engage, in a particular line of questioning on cross-examination.'" *State v. Dorsey*, 10th Dist. Franklin No. 04AP-737, 2005-Ohio-2334, ¶ 22, quoting *In re Brooks*, 10th Dist. Franklin No. 04AP164, 2004-Ohio-3887, ¶ 40; *see also State v. Allah*, 4th Dist. Gallia No. 14CA12, 2015-Ohio-5060, ¶ 23.

{¶ 40} After our review, we do not believe that the record supports the argument that the cross-examination of T.B. and her friends fell outside the realm of trial strategy. The record demonstrates that counsel's strategy was to portray T.B. and her friends as "high functioning" despite their disabilities. By doing so, counsel apparently sought to minimize the state's attempt to portray T.B. and her friends as vulnerable to Morton's predatory behavior, thus, garnering more sympathy for them. In light of the sensitive nature of this case, which involved a developmentally disabled victim of sexual assault, counsel's decision not to cross-examine T.B. and her friends as to their disabilities does not constitute ineffective assistance of trial counsel.

{¶ 41} The next area Morton claims his counsel was ineffective in was his failure to properly cross-examine inconsistencies in witness statements. According to Morton, "Stories changed significantly from the police report and body camera footage to the actual testimony."

{¶ 42} Two of the inconsistencies Morton complains about relate to statements the witnesses gave to the police versus their testimony at trial. The police reports are not part of the record, however, and thus we are unable to review those contentions. But we do note that they do not appear to be "glaring inconsistencies," such as counsel's decision not to cross-examine on them would be deficient or would have produced a different result. The other alleged inconsistency — whether T.B. arrived at the house on her bicycle or if her mother drove her — was likewise not game-changing. Again, defense counsel defended this case with the strategy that T.B. and her friends were "highly functioning," despite their disabilities; it was sound strategy not to cross-examine the witnesses on these alleged inconsistencies.

{¶ 43} The final instance of alleged ineffectiveness of his counsel Morton cites is counsel's failure to introduce exculpatory and mitigating evidence. Specifically, Morton challenges counsel's decision to not admit the police body-camera footage despite referring to it on cross-examination of T.B. and during closing argument. The record reflects that counsel questioned T.B. on cross-examination about how her trial testimony differed from what she initially told the police during her second encounter with them that day. Counsel got her to admit the most relevant inconsistency: that she told the police on the scene that she did not believe Morton had raped her.

{¶ 44} Thus, in light of the above, we do not find that any of Morton's contentions of instances of his counsel performing ineffectively to be with merit. The first assignment of error is overruled.

**Cumulative Error**

{¶ 45} In his second assignment of error, Morton contends that the cumulative errors that occurred deprived him of a fair trial. We disagree.

{¶ 46} Under the doctrine of cumulative error, a conviction will be reversed when the cumulative effect of errors in a trial deprives a defendant of the constitutional right to a fair trial even though each of the errors does not individually constitute cause for reversal. *State v. Obermiller*, 8th Dist. Cuyahoga No. 101456, 2019-Ohio-1234, ¶ 52, citing *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, 960 N.E.2d 955, ¶ 132. However, the doctrine of cumulative error is inapplicable when the alleged errors are found to be harmless or nonexistent. *Id.*, citing *id.*

{¶ 47} Because we have determined that none of the individual claims of error are well taken, the claim of cumulative error likewise fails.

{¶ 48} The second assignment of error is overruled.

**Conclusion**

{¶ 49} It is a well-settled rule that a defendant is entitled to a fair, but not perfect, trial. *See United States v. Hasting*, 461 U.S. 499, 508-509, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983); *State v. Lott*, 51 Ohio St.3d 160, 166, 555 N.E.2d 293 (1990).

We are satisfied, upon a thorough review of the record, that Morton had a fair trial and competent representation.

**{¶ 50}** Our review of the record demonstrates that counsel zealously advocated on Morton's behalf. He presented a reasonable defense: that the victim and her friends were "high functioning" and acquiesced to him hanging around with them for the day, and by implication, that the encounter between him and T.B. was consensual.

**{¶ 51}** Counsel moved for a mistrial based on an allegation of juror misconduct, and he also moved for a Crim.R. 29 judgment of acquittal. He lodged numerous objections throughout the trial, many of which were successful. When we review the trial as a whole, we do not find that Morton's counsel's performance fell below an objective standard of reasonable representation, and that there was a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different.

**{¶ 52}** Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's convictions having been affirmed, any bail pending is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.


_____
LARRY A. JONES, SR., PRESIDING JUDGE

MARY EILEEN KILBANE, J., and
LISA FORBES, J., CONCUR